Shipyard River Terminal Company v. Commissioner.
Shipyard River Terminal Co. v. Commissioner
Docket No. 3173.
United States Tax Court
1944 Tax Ct. Memo LEXIS 13; 3 T.C.M. (CCH) 1292; T.C.M. (RIA) 44400; December 9, 1944
*13 Marion Smith, Esq., and Bertram S. Boley, Esq., 1045 Hurt Bldg., Atlanta, Ga., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves a deficiency of $2,404.29 in income tax for the taxable year 1940, of which amount $1,999.78 is contested. The sole issue is whether the respondent erred in disallowing $6,300 of a claimed deduction of $7,500 on account of salary paid to W. R. Sullivan in the taxable year. We find the facts to be as follows: Findings of Fact The petitioner is a corporation with its principal office at No. 14 Broad Street, Charleston, South Carolina. Its income tax return for the calendar year 1940 was filed with the collector of internal revenue for the district of South Carolina. The petitioner was organized in 1937 with a capital stock of $5,000. Petitioner's business is a service business, which consists of handling and storing fertilizer materials including nitrate of soda in bulk. Petitioner was organized by W. R. Sullivan at the suggestion of J. A. Woods, then executive vice-president of the Chilean Nitrate Sales Company. Woods told Sullivan that his company would *14 make a two year contract to give its storage business to Sullivan if the latter established facilities at Charleston for storing nitrate. Sullivan was instrumental in organizing the petitioner and arranging the necessary financing to establish such facilities. He owned ninety-nine and a fraction percent of the capital stock. Since its organization, Sullivan has been the petitioner's president and one of its two directors. Although Sullivan resides in Atlanta, Georgia, he has made occasional trips to the plant in Charleston and has kept continuously in touch with petitioner's business through daily, weekly and monthly reports. Ninety percent of the petitioner's business was acquired through the personal solicitation and contacts of its president. Sullivan owns ninety-nine and a fraction percent of the capital stock of Etiwan Fertilizer Company, of Charleston, South Carolina. By reason of his connection with the Etiwan Company, Sullivan was able to arrange with that company to furnish petitioner with plant supervision and stenographic and bookkeeping services at a much lower cost than the petitioner would have been required to pay if it had independently procured them. Sullivan had *15 many other business interests in addition to that of the petitioner and the Etiwan Fertilizer Company. He was connected with the National Nu-Grape Company, from which he received a salary of $17,000 in 1940. During the taxable year he owned a five-sixths interest in the Cheshire-Sullivan Company and was vice-president and a director of Merchants Fertilizer Company. He received no salary from either of these two last mentioned companies in 1940. The petitioner's net income, as reported on its income tax returns, was as follows: Year
Net Income
1937
$19,707.31
1938
23,640.07
1939
47,871.79
1940
47,095.91
The compensation paid to the officers of the petitioner for the years 1937 to 1940, inclusive, was as follows: Officer
1937
1938
1939
1940
W. R. Sullivan, Presi-
dent
$7,500
John E. Gibbs, Vice-
Pres. & Treas
4,000
James G. Gibbs, Sec-
retary $630 $890
$1,240
2,740
Petitioner in the taxable year declared and paid a dividend in the amount of $37,500. The salaries paid by the petitioner to its officers in the year 1940 were duly authorized by its Board of Directors. In fixing the salaries of the president and vice-president for the *16 year 1940, the Board considered the fact that no payments had been made for services rendered in previous years and the amount as fixed was intended to cover services rendered in the years 1937, 1938, 1939 and 1940. The respondent, in determining the deficiency, allowed W. R. Sullivan a salary of $1,200 for the year 1940. The amount of $7,500, paid in 1940 by the petitioner to its president, W. R. Sullivan, was a reasonable compensation for the services he rendered to that corporation. Opinion The single issue is whether the respondent's action in reducing the allowance for salary to the petitioner's president from $7,500 to $1,200 should be sustained. Cases of this character must stand upon their own peculiar facts and circumstances. The salary in question was fixed by the petitioner's Board of Directors. Official action ordinarily imports an inference that the allowances fixed are reasonably commensurate with the services rendered or to be rendered. Lucas v. Ox Fibre Brush Co., 32 F.2d 42, aff'd, 281 U.S. 115, 74 L. Ed. 733, 50 S. Ct. 273; Toledo Grain & Milling Co. v. Commissioner, 62 F.2d 171. Since the *17 questioned salary was fixed by a board of two directors, one of whom was the president whose salary is involved and who owned ninety-nine and a fraction per cent of the company's capital stock, the inference to be drawn from official action is not in itself sufficient to overcome the presumption of the correctness of the respondent's determination. We think, however, that the undisputed evidence supports the inference that the salary of the president was reasonable. The president, W. R. Sullivan, was primarily responsible for the organization of the petitioner. He arranged the necessary financing to establish and extend the facilities to engage in the business for which the petitioner was organized. Not only was Sullivan familiar with the fertilizer trade, but he enjoyed the acquaintance with and confidence of officers of many other companies who might be induced to become clients of the petitioner. From the time the petitioner was organized, to the taxable year in question, Sullivan solicited business on behalf of the petitioner. The evidence discloses that ninety per cent of the petitioner's business resulted from the personal efforts of its president. The petitioner prospered *18 from the start. The demand for its storage facilities increased. The responsibility for meeting this demand rested upon and was discharged by Sullivan. The net revenue of the petitioner increased from $19,707.31 in 1937 to $47,095.91 in the taxable year 1940. The executive head of a corporation has the responsibility not only of protecting the company's investment, but of organizing and conducting the business so as to produce a profit. Petitioner's net earnings over the first four years of its existence satisfies us that W. R. Sullivan discharged his responsibilities as chief executive in a satisfactory manner. That he devoted only such time as the discharge of his responsibilities necessitated is not of serious importance. The capable manner in which he performed his duty entitles him to a reasonable and proper compensation. See Express Publishing Co. v. Commissioner, 143 F.2d 386. It appears that no salary was paid either to the petitioner's president or vice-president prior to 1940. In fixing and paying his salary for 1940, the petitioner properly considered the fact that Sullivan had not received any salary for the services he had rendered *19 to it in the three prior years. Lucas v. Ox Fibre Brush Co., supra.In the light of the financial success achieved by the petitioner under Sullivan's active executive direction, the fact that it paid dividends in the amount of $37,500 in the taxable year, and the other evidence, convinces us that the salary of $7,500 was not unreasonable for the services rendered by W. R. Sullivan in the taxable year 1940. We conclude that the payment of $7,500 as salary to W. R. Sullivan was an ordinary and necessary business expense properly deductible by the petitioner in computing its income tax for the calendar year 1940, under the provisions of section 23 (a) of the Internal Revenue Code. Decision will be entered under Rule 50.